BRODSKY & SMITH, LLC
Evan J. Smith, Esquire (SBN 242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone: (310) 300-8425
Facsimile:  (310) 247-0160

*Attorneys for Plaintiff*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JULIE HORN, Individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HOT TOPIC, INC., LISA M. HARPER, MATTHEW A. DRAPKIN, TERRI FUNK GRAHAM, STEVEN R. BECKER, EVELYN D'AN, W. SCOTT HEDRICK, JOHN EDWARD KYEES, ANDREW SCHUON, THOMAS G. VELLIOS, SYCAMORE PARTNERS MANAGEMENT, L.L.C., 212F HOLDINGS LLC, and HT MERGER SUB, INC.,<br><br>Defendants. | CASE NO.<br><br>**CLASS ACTION**<br><br>CV13-02939 SJO(JCx)<br>**JURY TRIAL DEMANDED**<br><br>BY FAX |

## CLASS ACTION COMPLAINT

Plaintiff Julie Horn ("Plaintiff") brings this Class Action Complaint ("Complaint") against the Board of Directors of Hot Topic, Inc. ("Hot Topic" or "Company") for breaching their fiduciary duties, and against Sycamore Partners Management, L.L.C. ("Sycamore Partners"), 212F Holdings LLC ("212F Holdings"), and HT Merger Sub Inc. ("Merger Sub") (collectively, "Sycamore") for aiding and abetting these breaches. This

action seeks to enjoin the shareholder vote relating to the acquisition of the publicly owned shares of Hot Topic common stock by Sycamore as detailed herein ("Proposed Transaction"), until Hot Topic shareholders are provided with sufficient information to cast a fully informed vote regarding the Proposed Transaction. This action also seeks to order the Hot Topic Board of Directors ("Individual Defendants" or "Board") to comply with its fiduciary obligations, and to award Plaintiff and the Class damages suffered as a result of Defendants' wrongdoing.

The allegations of this Complaint are based on the knowledge of the Plaintiff as to herself, and on information and belief, including the investigation of counsel and publicly available information, as to all other matters.

## **<u>SUMMARY OF THE ACTION</u>**

1.      On March 7, 2013, Hot Topic and Sycamore announced that they had entered into a definitive merger agreement under which Sycamore will acquire the stock of Hot Topic for approximately $600 million in cash ("Merger Agreement"). Under the terms of the Proposed Transaction, Hot Topic shareholders will have the right to receive $14.00 for each share of Hot Topic common stock they own.

2.      The Hot Topic Board has breached its fiduciary duties by failing to maximize the consideration available to Hot Topic shareholders, and by failing to provide Hot Topic shareholders with all material information concerning the Proposed Transaction. Sycamore has aided and abetted these breaches of fiduciary duty.

3.      The Individual Defendants have agreed to sell Hot Topic for an unfair price that was the result of a flawed sales process designed to benefit themselves to the detriment of Plaintiff and other public shareholders.

4.      Hot Topic is a remade company, whose stock has been steadily rising since the Company engaged in a series of cost-cutting and strategic measures. Beginning in November 2010, and continuing through 2012, the Company closed about 50 underperforming stores, closed its online digital music website, ShockHound, stabilized the Hot Topic brand, opened a number of new Torrid stores, and implemented a vertical sourcing model for Torrid merchandise to improve operating margins. During this same period, the Board authorized the repurchase of $50 million in Company common stock, and increased the Company's quarterly cash dividend from seven cents per share to eight cents per share.

5.      The Company's stock price responded to this business strategy, increasing nearly 75%. From November 1, 2010 to November 1, 2012, the stock rose from $5.44 per share to $9.50 per share.

6.      The Company's latest sales results indicate that the Company's upward trajectory remains strong. On February 6, 2013, the Company announced its sales results for the fourth quarter of 2012. As part of its results, the Company boasted a 15.1% increase in Torrid net sales compared to the last year, and a 6.3% increase in total company net sales compared to the last year. In addition, the Company reaffirmed its 2013 earnings guidance in the range of an increase of 30 to 35% over fiscal 2012, and reiterated its plan to open 40 new locations of its Torrid stores in 2013.

7.      On the strength of these indicators, research analysts had set one-year price targets for Hot Topic common stock as high as $16.40 per share.

8.      More to the point, analysis by Hot Topic's advisor, Guggenheim Securities, LLC ("Guggenheim"), also suggests that the $14.00 per share offer is inadequate. Guggenheim's illustrative discounted cash flow analysis resulted in an overall reference range for Hot Topic common

1  stock of $12.50 to $18.25 per share, placing the $14.00 per share offer at the
2  bottom half of this range.

3       9.    The Board also engaged in a flawed sales process. Between the
4  second week of January and the first week of February, Guggenheim spoke
5  with a total of *11* entities, all of whom were private equity firms. And of
6  these 11 firms, only one, Company A, executed a confidentiality agreement
7  with the Company. Guggenheim declined to reach out to strategic buyers,
8  believing that there were not likely to be any interested strategic buyers. The
9  Board never directed Guggenheim to contact more than the 11 entities that
10  were initially contacted and never directed Guggenheim to contact any
11  strategic buyers.

12       10.   Even with an interested party Guggenheim and the Board failed
13  to give full consideration to Company A's offer of $14.00 per share – the
14  very price being offered by Sycamore. Instead, the Board rushed to finalize
15  a potential transaction with Sycamore, citing the vague potential for
16  "adverse events" with the debt markets, the Company's sales, and the retail
17  industry as a whole, even as Lisa Harper, the Chief Executive Officer
18  ("CEO") and Chairman of the Board of Hot Topic, boasted of strong sales
19  growth.

20       11.   The Proposed Transaction also greatly favors Company
21  insiders to the detriment of the Class as a whole. Among other things,
22  executives and directors of Hot Topic have negotiated, for themselves,
23  equity interests in the surviving corporation, and the accelerated vesting of
24  their options, worth approximately $9.78 million (of which more than $7.2
25  million is for the benefit of Hot Topic's Directors). In addition, Ms. Harper
26  may be reimbursed for up to $3.5 million in tax payments. Despite a
27  fiduciary obligation to maximize shareholder value, the Board has allowed
28

these significant benefits to intrude into the sales process, a process ordinarily designed to maximize shareholder value.

12.     Ms. Harper and affiliates of Becker Drapkin Management, one of the Company's largest shareholders, have entered into voting agreements with Sycamore. Under these voting agreements, Ms. Harper and the affiliates of Becker Drapkin Management have agreed to vote all of their shares of Hot Topic common stock in favor of approval of the Merger Agreement and against any competing transaction. Including Company stock options that are exercisable within 60 days of March 18, 2013, these voting agreements lock up 10.3% of the outstanding shares of the Company's common stock in favor of approval of the Proposed Transaction.

13.     The Hot Topic Board further breached its fiduciary duties by agreeing to a number of deal protection provisions that dissuade competing bidders who, but for those provisions designed to chill their interest, could offer more value to the Company's shareholders. Specifically, the Merger Agreement includes:

a.     a "*no solicitation*" provision that precludes the Board from attempting to maximize shareholder value by soliciting or negotiating with any other potential acquirer and requires that the Board cease all such existing communications and negotiations;

b.     an "*information rights*" provision that requires the Board to give full information about competing acquisition proposals to Sycamore (including the identity of the suitor and the terms and conditions of any competing offer) within 48 hours of their receipt;

c.     a "*matching rights*" provision that allows Sycamore the right to match any competing proposal once they receive the relevant information; and

d.    a "*termination fee*" provision whereby the Board agreed that Hot Topic would pay Sycamore a termination fee of $21 million if Hot Topic terminates the Proposed Transaction because of a superior or alternative proposal in the event the Company receives a higher offer for the Company and its shareholders, despite the no solicitation provision.

14.    Finally, on March 25, 2013, Defendants filed a Preliminary Proxy Statement ("Proxy") on Schedule 14A with the US Securities and Exchange Commission ("SEC") in connection with the Proposed Transaction, which contained numerous material misstatements and omissions. For example, the Proxy fails to include material information concerning: (a) the sales process and background of the Proposed Transaction; and (b) the key data and inputs underlying the financial valuation analyses that purport to support the so-called "fairness opinion" provided by Guggenheim.

15.    In sum, Defendants failed to maximize shareholder value and to protect the interests of Hot Topic's shareholders, and instead, engaged in a process that was designed to secure material personal benefits for themselves. Each of the Individual Defendants has breached his or her fiduciary duties, and/or has aided and abetted such breaches, by favoring his or her own financial interests over those of Hot Topic and the public shareholders, and by disseminating false and misleading information in connection with the shareholder vote. The materially misleading Proxy also violates Section 14 of the Securities and Exchange Act of 1934 ("Exchange Act"). As a result, Plaintiff and the other Hot Topic public shareholders are receiving an unfair price in the Proposed Transaction and are being asked to vote on the Proposed Transaction without all of the necessary and material information needed to cast a fully informed vote.

16.     In facilitating the acquisition of Hot Topic by Sycamore for inadequate consideration and through a flawed process, each of the Defendants breached and/or aided the other Defendants' breaches of their fiduciary duties. As set forth below, instead of working to maximize shareholder value as required, Defendants agreed to hand over the Company and its future prospects to Sycamore for an unfair price. If Defendants are able to consummate the Proposed Transaction, Hot Topic's public shareholders will be unable to share in the future success of the Company. The $14.00 per share amount does not reflect Hot Topic's intrinsic value nor does it reflect the value of the Company as the target of a full and fair sales process.

17.     For these reasons and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from soliciting shareholder votes relating to the Proposed Transaction or, in the event the Proposed Transaction is consummated, recover damages resulting from the Individual Defendants' (as defined herein) violations of their fiduciary duties and from Sycamore.

## JURISDICTION AND VENUE

18.     Jurisdiction is founded upon federal question jurisdiction, pursuant to § 27 of the Exchange Act, as amended, 15 U.S.C. § 78aa. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a).

19.     Venue is proper under 28 U.S.C. § 1391(b)(2) because Hot Topic maintains offices in this District, and a substantial part of the events or omissions giving rise to the claim occurred in this District. Moreover, each of the Individual Defendants as an officer and/or director of the Company has extensive contacts within this District.

**PARTIES**

20.    Plaintiff was, and at all relevant times is a, continuous shareholders of Defendant Hot Topic.

21.    Defendant Hot Topic, Inc. is a corporation organized and existing under the laws of the State of California with its principal executive offices located at 18305 E. San Jose Avenue, City of Industry, California, 91748.

22.    Defendant Lisa M. Harper is the CEO and Chairman of the Board of Directors of Hot Topic.  She has served on the Board since June 2008. Ms. Harper owns more than 677,000 shares of Hot Topic common stock, representing 1.6% of the shares beneficially owned.

23.    Defendant Matthew A. Drapkin has served as a director of the Company since October 2010. Mr. Drapkin owns more than 3.59 million shares of Hot Topic common stock, representing 8.8% of the shares beneficially owned.

24.    Defendant Terri Funk Graham has served as a director of the Company since June 2012. Mr. Graham owns more than 2,600 shares of Hot Topic common stock.

25.    Defendant Steven R. Becker has served as a director of the Company since October 2010. Mr. Becker owns more than 3.59 million shares of Hot Topic common stock, representing 8.8% of the shares beneficially owned.

26.    Defendant Evelyn D'An has served as a director of the Company since June 2007. Ms. D'An owns more than 101,000 shares of Hot Topic common stock.

27.    Defendant W. Scott Hedrick has served as a director of the Company since January 2002. Mr. Hedrick owns more than 166,000 shares of Hot Topic common stock.

28.     Defendant John Edward Kyees has served as a director of the Company since March 2012. Mr. Kyees own more than 4,000 shares of Hot Topic common stock.

29.     Defendant Andrew Schuon has served as a director of the Company since January 1998. Mr. Schuon owns more than 98,000 shares of Hot Topic common stock.

30.     Defendant Thomas G. Vellios has served as a director of the Company since June 2008. Mr. Vellios owns more than 88,000 shares of Hot Topic common stock.

31.     Defendants Harper, Drapkin, Graham, Becker, D'An, Hedrick, Kyees, Schuon, and Vellios, are collectively referred to herein as the "Board" or the "Individual Defendants."

32.     Defendant Sycamore Partners Management, L.L.C. is a private equity firm based in New York City specializing in consumer and retail investments.

33.     Defendant 212F Holdings, LLC is a Delaware limited liability company, and an affiliate of Sycamore. 212F Holdings was formed for the sole purpose of entering into the Merger Agreement and consummating the Proposed Transaction.

34.     Defendant HT Merger Sub Inc. is a California corporation, and a wholly owned subsidiary of 212F Holdings. HT Merger Sub Inc. was formed for the sole purpose of entering into the Merger Agreement and consummating the Proposed Transaction.

35.     Collectively, Hot Topic, the Individual Defendants, Sycamore Partners, 212F Holdings, and Merger Sub are referred to herein as the "Defendants."

## INDIVIDUAL DEFENDANTS' FIDUCIARY DUTIES

36.     By reason of Individual Defendants' positions with the

Company as officers and/or directors, they are in a fiduciary relationship with Plaintiff and the other public shareholders of Hot Topic and owe them a duty of care, loyalty, good faith, candor, and independence.

37.     To diligently comply with their fiduciary duties, the Individual Defendants may not take any action that:

    a.  adversely affects the value provided to the corporation's shareholders;

    b.  favors themselves or will discourage or inhibit alternative offers to purchase control of the corporation or its assets;

    c.  adversely affects their duty to search and secure the best value reasonably available under the circumstances for the corporation's shareholders; and/or

    d.  will provide the Individual Defendants with preferential treatment at the expense of, or separate from, the public shareholders.

38.     In accordance with their duties of loyalty and good faith, the Individual Defendants are obligated to refrain from:

    a.  participating in any transaction where the Individual Defendants' loyalties are divided;

    b.  participating in any transaction where the Individual Defendants receive, or are entitled to receive, a personal financial benefit not equally shared by the public shareholders of the corporation; and/or

    c.  unjustly enriching themselves at the expense or to the detriment of the public shareholders.

**AIDING AND ABETTING**

39.    In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Defendants further aided and abetted and/or assisted each other in breach of their respective duties as herein alleged.

40.    During all relevant times hereto, the Defendants, and each of them, initiated a course of conduct which was designed to: (i) permit Sycamore to attempt to eliminate the public shareholders' equity interest in Hot Topic pursuant to a defective sales process; (ii) permit Sycamore to buy the Company for an unfair price; and (iii) permit Sycamore to buy the Company without Hot Topic shareholders being fully informed of all material information relating to the Proposed Transaction. In furtherance of this plan and course of conduct, Defendants, and each of them, took the actions as set forth herein.

41.    Each of the Defendants herein aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions, as particularized herein, to substantially assist the commission of the wrongdoing complained of, each Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to, and furtherance of, the wrongdoing. The Defendants' acts of aiding and abetting included, *inter alia,* the acts each of them are alleged to have committed in furtherance of the common enterprise and common course of conduct complained of herein.

**CLASS ACTION ALLEGATIONS**

42.    Plaintiff brings this action on her own behalf and as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all other holders of Hot Topic common stock who are being and will be harmed by Defendants' actions described below ("Class"). Excluded from

1  the Class are Defendants herein and any person, firm, trust, corporation or

2  other entity related to or affiliated with any of the Defendants.

3       43.    This action is properly maintainable as a class action because:

4           a.    The Class is so numerous that joinder of all members is

5  impracticable. As of March 7, 2013, there were 42.31 million shares

6  of Hot Topic common stock issued and outstanding. The actual

7  number of public shareholders of Hot Topic will be ascertained

8  through discovery.

9           b.    There are questions of law and fact that are common to

10 the Class, including the following:

11              i)      whether the Individual Defendants have breached

12                      their fiduciary duties with respect to Plaintiff and

13                      the other members of the Class in connection with

14                      the Proposed Transaction;

15              ii)     whether the Individual Defendants have breached

16                      their fiduciary duty to obtain the best price

17                      available for the benefit of Plaintiff and the other

18                      members of the Class in connection with the

19                      Proposed Transaction;

20              iii)    whether the Individual Defendants misrepresented

21                      and omitted material facts in violation of their

22                      fiduciary duties owed by them to Plaintiff and the

23                      other members of the Class;

24              iv)     whether Sycamore aided and abetted the

25                      Individual Defendants' breaches of fiduciary duty;

26                      and

27              v)      whether Plaintiff and the other members of the

28                      Class would suffer irreparable injury were the

Proposed Transaction complained of herein consummated.

c.      Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class.

d.      Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class.

e.      The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class that would establish incompatible standards of conduct for the party opposing the Class.

f.      Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

## SUBSTANTIVE ALLEGATIONS

**A.  Background**

44.     Hot Topic is a mall and web based specialty retailer operating the Hot Topic and Torrid concepts, as well as a new test retail concept, Blackheart. Hot Topic offers music/pop culture-licensed and music/pop culture-influenced apparel, accessories, music and gift items for young men and women. Torrid retails on-trend fashion apparel, lingerie and accessories inspired by and designed to fit the young, voluptuous woman who wears size 12 and up. Blackheart offers an expanded collection of dark, edgy, sexy lingerie, accessories and beauty products. As of February 2, 2013, the Company operated 618 Hot Topic stores in all 50 states, Puerto Rico and

13

Canada, 190 Torrid stores, 5 Blackheart stores, and Internet stores hottopic.com, torrid.com and blackheartlingerie.com.

45. On November 14, 2012, the Company reported results for its third quarter of fiscal 2012, ended October 27, 2012. The Company reported net income in the third fiscal quarter of $4.3 million, or $0.10 per share, compared to net income of $3.1 million, or $0.07 per share, for the comparable period last year. Total sales for the third quarter of fiscal 2012 increased 2.0% to $179.4 million compared to $175.8 million for the third quarter last year. Total company comparable sales increased 0.2% for the third quarter of fiscal 2012. In response to the strong quarter, Ms. Harper stated, "We validated the new merchandising and sourcing strategies at Torrid this quarter, and continue to be enthusiastic about Torrid as a growth vehicle for the company." She added that, "Customers reacted positively to the new fashion-forward assortment and brand marketing introduced in late July, and our new vertical sourcing model significantly improved our gross margin rate. At Hot Topic, we continue to see improvement in the fashion apparel and tee businesses, which offset the challenges in the accessory categories."

46. The Company also announced that on November 13, 2012, its Board of Directors declared a regular quarterly dividend of $0.08 per share payable on December 28, 2012 to shareholders of record at the close of business on December 14, 2012.

47. On February 6, 2013, Hot Topic announced the sales results for its fourth fiscal quarter, ended February 2, 2013. As part of the announcement, the Company narrowed its fourth quarter guidance (14 weeks ended February 2, 2013) to earnings of $0.26 to $0.27 per share, as compared to earnings per share of $0.21 the previous year. Previously the Company's guidance was earnings in the range of $0.23 to $0.27 per share.

In addition, the Company reaffirmed its previously announced 2013 earnings guidance (52 weeks ending February 1, 2014) in the range of *an increase of 30 to 35%* over fiscal 2012 based upon a comp sales increase in the low-single-digit range. On the strength of these results, Ms. Harper stated, "We are pleased with the strong performance of both divisions, including the company's top-line sales growth, during the quarter and FY2012. The success of the new Torrid branding and vertical product strategies reinforces the brand's unit growth opportunity and – as previously announced – we plan to open 40 new Torrid locations in 2013." She added that, "Additionally, we expect many of the company's new merchandising, system and process initiatives will continue to gain traction in 2013, supporting continued comp growth and additional margin expansion in all brands." The Torrid brand showed particularly strong growth. Net sales for Torrid were $52.5 million for the fourth quarter, up 11.0% from the 2011 fourth quarter, and net sales for the 2012 fiscal year were $188.1 million, up 15.1% from the 2011 fiscal year.

48.    On March 13, 2013, the Company reported its fourth quarter 2012 financial results. The Company reported net income in the fourth quarter of $12.1 million, or $0.29 per share, compared to net income of $9.0 million, or $0.21 per share, for the fourth quarter of fiscal year 2011. Total sales for the fourth quarter of fiscal 2012 increased 11.0% to $233.0 million compared to $209.9 million for the fourth quarter of fiscal year 2011. Total Company comparable sales increased 2.6% for the fourth quarter of fiscal 2012. For the fiscal year of 2012, the Company reported net income of $19.5 million, or $0.46 per share, compared to a net loss of $1.8 million, or $0.04 per share, for fiscal year 2011. On the strength of these results, Ms. Harper stated that, "We're pleased with the Company's performance during the fourth quarter of 2012. Overall, we saw a strong performance at both

1  core divisions in terms of topline sales growth and gross margin
2  improvement. The major highlight of the quarter and the year was the
3  improved performance of Torrid where new merchandising, sourcing and
4  branding strategies continue to drive sales and margin."

5  **B.**      **The Proposed Transaction**

6  49.      On January 7, 2013, Hot Topic and Sycamore jointly issued a
7  press release announcing the Proposed Transaction:

> CITY OF INDUSTRY, Calif.--(BUSINESS WIRE)--Mar. 7, 2013--
> Hot Topic, Inc. (NASDAQ Global Select Market: HOTT) ("Hot
> Topic" or the "Company") and Sycamore Partners today announced
> that they have entered into a definitive agreement pursuant to which
> Sycamore Partners will acquire Hot Topic for $14.00 per share in
> cash, or a total of approximately $600 million. The agreement, which
> has been unanimously approved by Hot Topic's Board of Directors,
> represents a premium of approximately 30% over Hot Topic's closing
> stock price on March 6, 2013.
>
> Lisa Harper, Chief Executive Officer and Chairman of the Board of
> Hot Topic, said, "We are pleased that this transaction will allow us to
> deliver positive results for our shareholders. In addition, we are very
> excited about the future growth for the company and know that
> Sycamore Partners will provide great resources and expertise to us as
> we operate as a private company."
>
> "We are excited to partner with the Hot Topic management team and
> all of its talented and passionate employees," said Stefan Kaluzny,
> Managing Director of Sycamore Partners. "We look forward to
> supporting the Company's continued growth."
>
> The transaction, which is structured as a one-step merger with Hot
> Topic as the surviving corporation, is subject to customary closing
> conditions, including receipt of shareholder and regulatory approvals.
> The transaction requires the affirmative vote of holders of a majority
> of the Company's outstanding shares, which will be sought at a
> special meeting of shareholders.
>
> In connection with the merger agreement, Lisa Harper and Becker
> Drapkin Management LP, holders of 8.9% of the Company's stock,
> each signed customary support agreements indicating they would
> support the proposed transaction.
>
> Guggenheim Securities is acting as financial advisor to Hot Topic in
> connection with the transaction. Cooley LLP is acting as Hot Topic's
> legal advisor. BofA Merrill Lynch is acting as financial advisor to
> Sycamore Partners and Winston & Strawn LLP and the Law Offices
> of Gary M. Holihan, P.C. are acting as its legal counsel.

CLASS ACTION COMPLAINT

## C.     The Unfair Price

50.     The Individual Defendants have failed to secure an adequate price for Hot Topic shareholders. As consideration for the Proposed Transaction, Hot Topic shareholders will receive $14.00 in cash per share. This consideration is inadequate.

51.     Hot Topic is a remade company, whose stock has been steadily rising since the Company engaged in a series of cost-cutting and strategic measures. Beginning in November 2010, and continuing through 2012, the Company closed about 50 underperforming stores, closed its online digital music website, ShockHound, stabilized the Hot Topic brand, opened a number of new Torrid stores, and implemented a vertical sourcing model for Torrid merchandise to improve operating margins. During this same period, the Board authorized the repurchase of $50 million in Company common stock, and increased the Company's quarterly cash dividend from seven to eight cents per share.

52.     The Company's stock price responded to this business strategy, increasing nearly 75%. From November 1, 2010 to November 1, 2012, the stock rose from $5.44 per share to $9.50 per share.

53.     The Company's latest sales results indicate that Hot Topic's upward trajectory remains strong. On February 6, 2013, the Company announced its sales results for the fourth quarter of 2012.  As part of its results, the Company boasted a 15.1% increase in Torrid net sales compared to the last year, and a 6.3% increase in total company net sales compared to the last year. In addition, the Company reaffirmed its 2013 earnings guidance in the range of an increase of 30 to 35% over fiscal 2012, and reiterated its plan to open 40 new locations of its Torrid stores in 2013.

54.     On the strength of these indicators, research analysts had set one-year price targets for Hot Topic common stock as high as $16.40 per share.

55.     Moreover, analysis by Guggenheim suggests that the $14.00 per share offer is inadequate. Guggenheim's illustrative discounted cash flow analysis resulted in an overall reference range for Hot Topic common stock of $12.50 to $18.25 per share, placing the $14.00 per share offer at the bottom half of this range.

56.     In light of the Company's successful implementation of cost-cutting and strategic measures, recent strong performance, and positioning for continued growth, the Proposed Transaction consideration is inadequate. The Proposed Transaction will deny Plaintiffs the right to share proportionately and equitably in the true value of Hot Topic's valuable and profitable business.

57.     As these indicators make clear, Hot Topic would bring a price materially in excess of the amount offered in the Proposed Transaction if properly exposed to the market for corporate control.

D.      **The Flawed Sales Process**

58.     The Board engaged in a flawed sales process in the period leading up to the execution of the Merger Agreement.

59.     On November 20, 2012, Ms. Harper and Mr. Kaluzny discussed, in person, the idea of a strategic transaction between Sycamore and Hot Topic. By December 17, 2012, Ms. Harper and Mr. Drapkin had met with representatives of Guggenheim. On January 16, 2013, representatives of Guggenheim met with representatives of Company A. On March 6, 2013, the parties executed the Merger Agreement.

60.     According to the Proxy, between the second week of January and the first week of February, Guggenheim spoke with a total of *11*

entities, all of whom were private equity firms. Of the 11 private equity firms that were contacted, only one, Company A, executed a confidentiality agreement with the Company. Guggenheim declined to reach out to strategic buyers, believing that there were not likely to be any interested strategic buyers because Hot Topic's business consisted of concept stores. The Board never directed Guggenheim to contact more than the 11 entities that were initially contacted and the Board never directed Guggenheim to contact any strategic buyers.

61.     Even with an interested party Guggenheim and the Board failed to give full consideration to Company A. On March 4, 2013, Company A expressed an interest in acquiring the Company for $14.00 per share – the same price being offered by Sycamore. Nonetheless, that very day, the Board rushed to finalize a potential transaction with Sycamore, citing the vague potential for "adverse events" with the debt markets, the Company's sales, and the retail industry as a whole. The Proxy fails to present these risks as either concrete or impending.

62.     Finally, the Proxy states that Company A signed a standstill agreement with Hot Topic. The Proxy fails to disclose whether this standstill agreement contained a highly restrictive "No Ask, No Waiver" provision (like the one found in Sycamore's Confidentiality Agreement) which, in conjunction with the other deal protection devices, discussed below, would serve as an absolute bar to a post-merger topping bid. As a result, it is impossible for shareholders to know whether the Board prevented Company A from making a topping bid after the Merger Agreement was signed, which is particularly relevant since Company A had also submitted a bid for $14.00 per share. As such, the structure of this standstill agreement potentially amounts to a *prima facie* failure to maximize shareholder value.

**E.      Insiders Stand to Gain from the Proposed Transaction**

63.      Rather than negotiate a transaction that was in the best interests of Hot Topic's common shareholders, the Company's executive officers and directors are acting to better their own personal interests through the Proposed Transaction.

64.      Company executives and the directors negotiated "Rollover Agreements" with Sycamore, which will give these individuals an equity interest in Hot Topic following consummation of the merger. Ordinary shareholders do not have the option of receiving an equity interest in Hot Topic.

65.      Specifically, on March 6, 2013, Ms. Harper, Don Hendricks, Chief Operating Officer of the Company, Mark Mizicko, Chief Planning Officer of the Company, George Wehlitz, Jr., Chief Financial Officer of the Company, and Elizabeth Munoz, Senior Vice President of Product of the Company (collectively, "Rollover Investors") entered into Rollover Agreements with Sycamore, pursuant to which they committed to contribute cash and stock to Sycamore in exchange for equity securities of Sycamore. In all, the Rollover Investors will contribute a total of 33,838 shares of common stock (with a value of $474,000 based on $14.00 per share) and approximately $7.7 million in cash. The bulk of these shares and this cash belong to Ms. Harper, who has committed to rollover 30,160 shares of Company common stock and $5 million in cash.

66.      Sycamore will grant Ms. Harper restricted equity interests in Sycamore, consisting of an aggregate of 4% of the number of units to be issued at the closing of the Merger to Sycamore's preferred equity holders that will entitle Ms. Harper to participate in the residual equity of Sycamore after certain distributions have been made to preferred equity holders. Once vested these restricted equity interests will participate in the residual equity

of Sycamore, proportionally with Sycamore's other issued and outstanding units based on the number of issued and outstanding vested units, subject to the rights of the holders of Sycamore's preferred equity interests to receive certain specified returns on invested capital.

67.    Ms. Harper stands to receive other significant awards from the Proposed Transaction. If Ms. Harper were to be terminated following the Proposed Transaction, she would receive $1.3 million in cash. She also stands to receive more than $5.3 million due to the accelerated vesting of her stock options. The accelerated option payment is not contingent upon termination of employment, and will be paid in a lump sum following the closing of the Proposed Transaction. Ms. Harper will also receive $54,000 to cover her continued coverage under Hot Topic's group health insurance plan for 36 months following her termination (if she is fired), and will receive $75,000 as reimbursement for her attorneys' fees and tax advisory fees in connection with negotiation of the Proposed Transaction.

68.    The following table represents the compensation that Ms. Harper, and other Hot Topic executives may receive, in the event they are terminated:

| Name | Cash | Accelerated Vesting of Stock Options | Group Health Care Coverage Benefits | Tax Reimbursement | Other | Total |
|---|---|---|---|---|---|---|
| Lisa Harper | $1,300,000 | $5,343,141 | $54,000 | $2,644,116 | $75,000 | $9,416,257 |
| George Wehlitz, Jr. | $0 | $332,138 | $0 | $0 | $47,000 | $379,138 |
| Donald Hendricks | $225,000 | $998,250 | $9,000 | $0 | $0 | $1,232,250 |
| Mark Mizicko | $225,000 | $1,158,250 | $9,000 | $0 | $0 | $1,392,250 |

69.    In addition to these already sizable awards, Ms. Harper will be reimbursed for certain tax payments. In connection with entering into the Merger Agreement, Sycamore and Ms. Harper have agreed to enter into an

amended and restated executive employment agreement to provide that Ms. Harper is entitled to receive a gross-up payment in the event that any payment or benefit provided to her in connection with a change in control becomes subject to certain excise taxes. The value of the gross up to Ms. Harper is estimated to range between approximately $2,644,116 (as noted above) and $3,546,277, depending upon whether or not Ms. Harper's employment is terminated within one year of the completion of the Proposed Transaction and whether or not Hot Topic is able to rebut certain presumptions regarding the equity granted to Ms. Harper in connection with the Proposed Transaction.

70. Ms. Harper is not the only director who stands to materially gain from the Proposed Transaction. As of March 18, 2013, there were 575,903 shares of Hot Topic common stock subject to outstanding stock options with exercise prices below $14.00 per share and 21,008 shares of outstanding unvested restricted common stock granted under equity incentive plans to Hot Topic non-employee directors. Assuming no options are exercised between March 18, 2013 and the consummation of the Proposed Transaction, Hot Topic's non-employee directors will receive, in the aggregate, $4,004,635 pursuant to the Merger Agreement in connection with the cancellation of their options and vesting of restricted stock, of which $2,057,745 is attributable to options vested as of March 18, 2013, $1,652,778 is attributable to options that were not vested as of such date, and $294,112 is attributable to shares of restricted common stock that were not vested as of such date.

71. Taken together, the Individual Defendants stand to receive more than $7.2 million from the accelerated vesting of their Hot Topic options. The following table represents the estimated intrinsic value of the Hot Topic stock options that accelerate and vest in connection with the

Proposed Transaction:

| Director | Accelerated Vesting of Stock Options |
|---|---|
| Lisa Harper | $5,343,141 |
| Steven Becker | $266,759 |
| Evelyn D'An | $294,908 |
| Matthew Drapkin | $266,759 |
| Terri Funk Graham | $110,012 |
| W. Scott Hedrick | $294,908 |
| John Kyees | $123,730 |
| Andrew Schuon | $294,908 |
| Thomas Vellios | $294,908 |
| **Total:** | **$7,290,033** |

72.     Finally, the Merger Agreement provides that Sycamore will indemnify each present director and officer of the Company to the fullest extent permitted. In addition, Sycamore will maintain Hot Topic's current insurance coverage for the Company's directors and officers for at least six years following the completion of the Proposed Transaction.

**F.     The Preclusive Deal Protection Devices**

73.     The Proposed Transaction is also unfair because, as part of the Merger Agreement, the Individual Defendants agreed to certain onerous and preclusive deal protection devices that operate conjunctively to make the Proposed Transaction a *fait accompli* and to ensure that no competing offers will emerge for the Company.

74.     The Merger Agreement contains a "no solicitation" provision prohibiting the members of the Board from taking any affirmative action to comply with their fiduciary duties to maximize shareholder value, including soliciting alternative acquisition proposals or business combinations. Section 4.3(b) of the Merger Agreement contains a "no solicitation" provision that restricts Hot Topic from considering alternative acquisition proposals by, among other things, constraining Hot Topic's ability to solicit

or communicate with potential acquirers or consider their proposals. Specifically, the provision prohibits Hot Topic from soliciting any alternative proposal, but permits the Board to consider an unsolicited proposal only if it constitutes or is reasonably calculated to lead to a "Superior Offer" as defined in the Merger Agreement. However, even the Board's consideration of an unsolicited proposal is restricted: prior to considering any such proposal, the Board must determine, in consultation with its financial advisors, that its fiduciary duties *require* it to consider the proposal. This section also demands that the Company terminate any and all prior or on-going discussions with other potential suitors. Thus, the Board cannot consider alternative proposals even if it reasonably believes that any such proposal would be beneficial to shareholders.

75.    Section 4.3(c) of the Merger Agreement goes further to reduce the possibility of a topping offer from an unsolicited purchaser. The Individual Defendants agreed to provide Sycamore with information in order to match any other offer, thus providing Sycamore access to the unsolicited bidder's identity and the material terms of the bidder's offer.

76.    Section 4.3 of the Merger Agreement states:

**4.3 No Solicitation; Change in Recommendation**.

**(a)** For the purposes of this Agreement, "***Acceptable Confidentiality Agreement***" means any customary confidentiality agreement that contains confidentiality and standstill provisions that are no less favorable in the aggregate to the Company than those contained in the Confidentiality Agreement, except that an Acceptable Confidentiality Agreement need not prohibit the submission of Acquisition Proposals or amendments thereto to the Company's Board of Directors on a private and confidential basis and that an

Acceptable Confidentiality Agreement shall not contain terms and conditions similar to those contained in the first sentence of the last paragraph of Section 7 of the Confidentiality Agreement. The Company shall use reasonable best efforts to enforce the terms and conditions of any such Acceptable Confidentiality Agreement entered into by the Company, except where such action could reasonably constitute a breach of fiduciary duties of the Company's Board of Directors to the Company's shareholders under applicable Legal Requirements.

**(b)** Except as permitted by this Section 4.3, the Company shall not and shall cause each of its Subsidiaries not to and shall not permit its Representatives to (i) from the date of this Agreement, continue (and the Company shall immediately cease, and cause each of its Subsidiaries to immediately cease and direct its Representatives to immediately cease) any solicitation, encouragement, discussions or negotiations with any Persons that may be ongoing with respect to an Acquisition Proposal and (ii) from the date of this Agreement until the Effective Time or, if earlier, the termination of this Agreement in accordance with Section 7, directly or indirectly, (A) solicit, initiate or knowingly facilitate or encourage (including by way of furnishing non-public information) any inquiries regarding, or the making of any proposal or offer that constitutes, or could reasonably be expected to lead to, an Acquisition Proposal, (B) engage in, continue or otherwise participate in any discussions or negotiations regarding, or furnish to any other Person any non-public information in connection with or for the purpose of

knowingly encouraging or facilitating, an Acquisition Proposal or (C) enter into any letter of intent, acquisition agreement, agreement in principle or similar agreement with respect to an Acquisition Proposal.

(c) If at any time on or after the date of this Agreement and prior to obtaining the Required Company Shareholder Vote, the Company or any of its Representatives receives a written Acquisition Proposal from any Person or group of Persons, which Acquisition Proposal was made or renewed on or after the date of this Agreement and did not result from any breach of this Section 4.3, (A) the Company and its Representatives may contact such Person or group of Persons to clarify the terms and conditions thereof and (B) if the Company's Board of Directors determines in good faith, after consultation with independent financial advisors and outside legal counsel, that such Acquisition Proposal constitutes or could reasonably be expected to lead to a Superior Offer, then the Company and its Representatives may (x) furnish, pursuant to (but only pursuant to) an Acceptable Confidentiality Agreement, information (including non-public information) with respect to the Company and its Subsidiaries to the Person or group of Persons who has made such Acquisition Proposal; provided that the Company shall promptly (and in any event within 48 hours) provide to Parent any material non-public information concerning the Company or any of its Subsidiaries that is provided to any Person given such access which was not previously provided to Parent or its Representatives and (y)

engage in or otherwise participate in discussions or negotiations with the Person or group of Persons making such Acquisition Proposal. From and after the date of this Agreement, the Company shall promptly (and in any event within 48 hours) provide to Parent (i) an unredacted copy of any such Acquisition Proposal made in writing provided to the Company or any of its Subsidiaries (including any financing commitments (including any Redacted Fee Letters) relating thereto) and (ii) a written summary of the material terms of any such Acquisition Proposal not made in writing (including any financing commitments relating thereto).

**(d)** Following the date of this Agreement, the Company shall keep Parent reasonably informed of any material developments, discussions or negotiations regarding any Acquisition Proposal on a prompt basis (and in any event within 48 hours) and upon the request of Parent shall reasonably inform Parent of the status of such Acquisition Proposal; *provided*, that, the Company shall not have any obligation to duplicate any notice provided under Section 4.3(c). The Company agrees that it and its Subsidiaries will not enter into any confidentiality agreement with any Person subsequent to the date hereof which prohibits the Company from providing any information to Parent in accordance with this Section 4.3.

**(e)** Except as expressly permitted by this Section 4.3(e) or Section 4.3(f), the Board of Directors of the Company shall not (i)(A) fail to recommend to its shareholders that the Required

Company Shareholder Vote be given (the "***Company Board Recommendation***") or fail to include the Company Board Recommendation in the Proxy Statement, (B) withhold, withdraw, qualify or modify, or publicly propose to withhold, withdraw, qualify or modify, in a manner adverse to Parent, the Company Board Recommendation, (C) make any recommendation or public statement in connection with a tender offer or exchange offer other than a recommendation against such offer or a customary "stop, look and listen" communication by the Board of Directors of the Company pursuant to Rule 14d-9(f) of the Exchange Act, (D) (1) fail to publicly recommend against any publicly announced Acquisition Proposal (and reaffirm the Company Board Recommendation) within ten business days after Parent so requests in writing or (2) fail to publicly reaffirm the Company Board Recommendation within ten business days after Parent so requests in writing; provided that, other than in connection with a competing Acquisition Proposal, Parent may only make two such requests or (E) adopt, approve or recommend, or publicly propose to approve or recommend to the shareholders of the Company, an Acquisition Proposal (actions described in this clause (i) being referred to as a "***Company Adverse Recommendation Change***") or (ii) authorize, cause or permit the Company or any of its Subsidiaries to enter into any letter of intent, agreement or agreement in principle or any Specified Agreement with respect to any Acquisition Proposal (other than an Acceptable Confidentiality Agreement). Notwithstanding anything to the contrary set forth in this Agreement, prior to the

CLASS ACTION COMPLAINT

time the Required Company Shareholder Vote is obtained, but not after, the Board of Directors of the Company may make a Company Adverse Recommendation Change, enter into a Specified Agreement with respect to an Acquisition Proposal not solicited in violation of this Section 4.3 or take any action pursuant to Section 7.1(f) if the Board of Directors of the Company has determined in good faith, after consultation with its financial advisor and outside legal counsel, (x) that failure to take such action could reasonably constitute a breach of fiduciary duties of the Board of Directors to the Company's shareholders under applicable Legal Requirements and (y) that such Acquisition Proposal constitutes a Superior Offer; *provided*, *however*, that (1) the Company has given Parent at least four calendar days' prior written notice of its intention to take such action (which notice shall include an unredacted copy of the Superior Offer, an unredacted copy of the relevant proposed transaction agreements and a copy of any financing commitments (including Redacted Fee Letters) relating thereto and a written summary of the material terms of any Superior Offer not made in writing, including any financing commitments relating thereto, in each case to the extent not previously provided pursuant to Section 4.3(c) or 4.3(d)), (2) the Company has negotiated, and has caused its Representatives to negotiate, in good faith with Parent during such notice period, to the extent Parent wishes to negotiate, to enable Parent to propose revisions to the terms of this Agreement, the Financing Letters, the Rollover Letters and the Guaranty such that it would cause such Superior Offer to no longer constitute a

CLASS ACTION COMPLAINT

Superior Offer, (3) following the end of such notice period, the Board of Directors of the Company shall have considered in good faith any proposed revisions to this Agreement, the Financing Letters, the Rollover Letters and the Guaranty proposed in writing by Parent in a manner that would form a binding contract if accepted by the Company, and shall have determined that the Superior Offer constitutes a Superior Offer if such revisions were to be given effect and (4) in the event of any material change to the material terms of such Superior Offer, the Company shall, in each case, have delivered to Parent an additional notice consistent with that described in clause (1) above and the notice period shall have recommenced, except that the notice period shall be at least two calendar days (rather than the four calendar days otherwise contemplated by clause (1) above); and provided, that any purported termination of this Agreement pursuant to this sentence shall be void and of no force and effect, unless the Company termination is in accordance with Section 7.1 and, to the extent required under the terms of this Agreement, the Company pays Parent the Termination Fee in accordance with Section 7.3 prior to or concurrently with such termination.

**(f)** Notwithstanding anything to the contrary herein, prior to the time the Required Company Shareholder Vote is obtained, but not after, the Board of Directors of the Company may withdraw or modify, or publicly propose to change, qualify, withhold, withdraw or modify, in a manner adverse to Parent, the Company Board Recommendation ("***Change of***

*Recommendation*") if the Board of Directors of the Company has determined in good faith, after consultation its financial advisor and outside legal counsel, that failure to take such action could reasonably constitute a breach of fiduciary duties of the Board of Directors to the Company's shareholders under applicable Legal Requirements; *provided*, *however*, that such action shall not be in response to a Superior Offer (which is addressed under Section 4.3(e)) and prior to taking such action, (x) the Board of Directors of the Company has given Parent at least four calendar days' prior written notice of its intention to take such action and a description of the reasons for taking such action, (y) the Company has negotiated, and has caused its Representatives to negotiate, in good faith with Parent during such notice period, to the extent Parent wishes to negotiate, to enable Parent to revise the terms of this Agreement, the Financing Letters, the Rollover Letters and the Guaranty in such a manner that would obviate the need for taking such action and (z) following the end of such notice period, the Board of Directors of the Company shall have considered in good faith any revisions to this Agreement, the Financing Letters, the Rollover Letters and the Guaranty proposed in writing by Parent in a manner that would form a binding contract if accepted by the Company, and shall have determined in good faith, after consultation with its financial advisor and outside legal counsel, that failure to effect a Change of Recommendation could reasonably constitute a breach of fiduciary duties of the Board of Directors to the Company's shareholders under applicable Legal Requirements.

1

2     **(g)** Nothing in this Section 4.3 or elsewhere in this Agreement

3     shall prohibit the Company from (i) taking and disclosing to the

4     shareholders of the Company a position contemplated by Rule

5     14e-2(a), Rule 14d-9 or Item 1012(a) of Regulation M-A

6     promulgated under the Exchange Act; *provided*, that any

7     disclosures permitted under this Section 4.3(g) that does not

8     contain either an express rejection of any applicable Acquisition

9     Proposal or an express reaffirmation of the Company Board

10     Recommendation shall be deemed a Company Adverse

11     Recommendation Change or (ii) making any disclosure to the

12     shareholders of the Company that is required by applicable

13     Legal Requirements; *provided* that making such disclosure

14     under Section 4.3(g)(ii) shall not in any way limit or modify the

15     effect, if any, that any such action has under Section 4.3.

16     77. In addition, Section 7.3 of the Merger Agreement contains a

17 prohibitive termination fee. Section 7.3 provides that under specified

18 circumstances the Company must pay a $21 million termination fee.

19     78. Finally, Ms. Harper and affiliates of Becker Drapkin

20 Management, one of the Company's largest shareholders, have entered into

21 voting agreements with Sycamore. Under these voting agreements, Ms.

22 Harper and the affiliates of Becker Drapkin Management agreed to vote all

23 of their shares of Hot Topic common stock in favor of approval of the

24 Merger Agreement and against any competing transaction. Including

25 Company stock options that are exercisable within 60 days of March 18,

26 2013, these voting agreements lock up 10.3% of the outstanding shares of

27 the Company's common stock in favor of approval of the Proposed

28 Transaction.

79.     Although the Board was obligated to maximize shareholder value, Ms. Harper has negotiated a voting agreement for her own interest, and against the best interests of Plaintiff and the Class. Indeed, Ms. Harper negotiated the voting agreements just as she negotiated, for her own benefit, the Rollover Agreement. Notably, the Proxy provides no discussion as to how or why these voting agreements were negotiated and executed.

80.     As a result of these voting agreements, the Proposed Transaction is virtually guaranteed to be approved – particularly since the Board failed to require approval of the transaction by a "majority of the minority" of Hot Topic shareholders. In order to protect the Company's minority public shareholders from the unfair Proposed Transaction, the Merger Agreement must be amended to include a "majority of the minority" voting provision that will cause the Merger Agreement to be approved only if a majority of the Company's minority public shareholders unaffiliated with Hot Topic vote to approve the Merger Agreement.

81.     Ultimately, these preclusive deal protection provisions improperly restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably constitute a superior proposal are too narrowly circumscribed to provide an effective "fiduciary out" under the circumstances.

**G.     Defendants Breached Their Fiduciary Duties by Filing a**
        **Materially False and Misleading Proxy Statement**

82.     It is critical that the shareholders receive complete and accurate information about the Proposed Transaction. To date, Defendants have failed to provide the Company's shareholders with that information. As set

forth in more detail below, the Proxy omits and/or misrepresents material information concerning, among other things: (a) the sales process for the Company; and (b) the data and inputs underlying the financial valuation exercises that purport to support the so-called "fairness opinion" provided by Guggenheim.

**1.    The Proxy Fails to Adequately Describe the Process and <u>Background That Resulted in the Proposed Transaction</u>**

83.    The Proxy fails to fully and fairly disclose certain material information concerning the Proposed Transaction, including (among other things):

a. On page 20, the Proxy states that Ms. Harper asked Guggenheim to provide preliminary views with respect to the valuation implications of the Company's long-range, non-United States generally accepted accounting principles ("GAAP") financial projections for fiscal years 2013 through 2018 ("LRP Projections"). The Proxy fails to disclose the results of Guggenheim's valuation of the LRP Projections. This omission is material because without the omitted information, Hot Topic's public shareholders are unable to assess whether the Board maximized shareholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of Hot Topic.

b. On page 21, the Proxy states that on December 22, 2012, Ms. Harper informed Stefan Kaluzny, a managing partner at Sycamore Partners, that his offer of $10.00 to $12.00 per share for the Company was too low, and that the Company "was not for sale." Yet, in the same sentence, the Proxy states that Ms.

Harper suggested that Mr. Kaluzny review the Company's publicly available information. The Proxy fails to disclose whether the Company was or was not, in fact, for sale, at this time. This omission is material because without the omitted information, Hot Topic's public shareholders are unable to assess whether the Board maximized shareholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of Hot Topic.

c. On page 21, the Proxy states that the Board considered Ms. Harper's prior experience with Guggenheim as one of the reasons for engaging the firm. The Proxy fails to disclose the nature of Ms. Harper's prior experience and/or relationship with Guggenheim. This omission is material because without the omitted information, Hot Topic's public shareholders are unable to assess what weight to give Guggenheim's fairness opinion, whether Guggenheim was conflicted in rendering its opinion, or whether the Board was conflicted in reviewing the opinion.

d. On page 21, the Proxy states that Ms. Harper, the Company's CEO, was appointed to the transaction committee. The Proxy fails to disclose the reasons that the Board selected a non-independent director to sit on the transaction committee, particularly since Ms. Harper would later resign from the committee. This omission is material because without the omitted information, Hot Topic's public shareholders are unable to assess whether the Board maximized shareholder value, whether other bidders may be willing to pay more for the

Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of Hot Topic.

e.  On pages 21-22, the Proxy states that the Company entered into confidentiality and standstill agreements with Sycamore and Company A. The Proxy states that the standstill agreement with Sycamore contained a "No Ask, No Waiver" provision, but the Proxy fails to disclose whether the standstill agreement with Company A contained the highly restrictive "No Ask, No Waiver" provision. This omission is material because without the omitted information, Hot Topic's public shareholders are unable to assess whether the Board maximized shareholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of Hot Topic.

f.  On page 22, the Proxy states that on January 17, 2013, less than a month after Ms. Harper stated that the Company "was not for sale," the Board indicated that it was supportive of a potential sale of the Company. The Proxy fails to disclose the reasons that the Board was suddenly willing to consider a sale of the Company. This omission is material because without the omitted information, Hot Topic's public shareholders are unable to assess whether the Board maximized shareholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of Hot Topic.

g.  On page 23, the Proxy states that Guggenheim contacted ten private equity funds, but that none of the ten firms executed a confidentiality agreement. The Proxy also states that

Guggenheim did not believe there were likely to be any interested strategic buyers because the Company consisted of concept stores. The Proxy fails to disclose whether Guggenheim did, in fact, contact any strategic buyers. If Guggenheim failed to contact any strategic buyers, as appears to be the case, the Proxy fails to disclose the reasons that Guggenheim believed a private equity fund would view and value the concept stores differently than a strategic buyer. This omission is material because without the omitted information, Hot Topic's public shareholders are unable to assess whether the Board maximized shareholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of Hot Topic.

h. On page 23, the Proxy states that Guggenheim contacted ten private equity funds, but that none of the ten firms executed a confidentiality agreement. The Proxy fails to disclose the reasons that Guggenheim failed to reach out to more private equity funds, particularly since Guggenheim believed that a strategic buyer was unlikely to be interested in the Company. This omission is material because without the omitted information, Hot Topic's public shareholders are unable to assess whether the Board maximized shareholder value, whether other bidders may be willing to pay more for the Company, and whether the Individual Defendants reasonably canvassed the market for potential acquirers of Hot Topic.

i. On page 23, the Proxy states that on February 1, 2013, Guggenheim told the Board that there was a "subset of

1    potential private equity fund buyers" that appeared interested in

2    engaging in further discussions. The Proxy fails to disclose

3    whether this "subset" was limited to the three (out of ten)

4    private equity funds initially contacted by Guggenheim. This

5    omission is material because without the omitted information,

6    Hot Topic's public shareholders are unable to assess whether

7    the Board maximized shareholder value, whether other bidders

8    may be willing to pay more for the Company, and whether the

9    Individual Defendants reasonably canvassed the market for

10   potential acquirers of Hot Topic.

11       j.   On page 27, the Proxy states that on March 4, 2013, the Board

12   was eager to finalize the deal with Sycamore for $14.00 per

13   share (even as Company A had also just offered $14.00 per

14   share) because of concerns of certain "adverse risks," including

15   risks relating to the Company's sales goals following "soft

16   February sales." The Proxy fails to disclose the reasons for

17   characterizing the February sales as "soft," particularly since

18   Ms. Harper had stated on February 6, 2013, that the Company

19   was "pleased with the . . . company's top-line sales growth,

20   during the quarter and FY2012" and would state on March 13,

21   2013, that she was "pleased with the Company's performance

22   during the fourth quarter of 2012. . . . [with] strong

23   performance at both core divisions in terms of topline sales

24   growth and gross margin improvement."

25   **2.    The Proxy Fails to Disclose Material Facts Concerning**

26         **Guggenheim's Fairness Opinion**

27       84.   In the Proxy, Guggenheim describes its fairness opinion and

28   the various valuation analyses it performed in support of its opinion.

However, the description of Guggenheim's opinion and analyses fails to include key inputs and assumptions underlying the analyses. Without this information, as described below, Hot Topic's public shareholders are unable to fully understand the analyses and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### *Discounted Cash Flow Analysis (page 40)*

85.     The Proxy fails to disclose material details concerning the analyses that Guggenheim performed in connection with the *Discounted Cash Flow Analysis*. The Proxy fails to disclose the basis for Guggenheim's decision to assume that the target capital structure would not include any debt. This omission is material because without this information, Hot Topic's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

### *LBO Analysis (page 41)*

86.     The Proxy fails to disclose material details concerning the analyses that Guggenheim performed in connection with the *LBO Analysis*. The Proxy fails to disclose the indicated leverage ratio. This omission is material because without this information, Hot Topic's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to vote on the Proposed Transaction.

87.     The Proxy fails to disclose the assumptions that Guggenheim used to arrive at an internal rate of return of 20% to 25%. This omission is material because without this information, Hot Topic's public shareholders are unable to fully understand the analysis and, thus, are unable to determine what weight, if any, to place on the fairness opinion in determining how to

1 vote on the Proposed Transaction.

2    88.    Accordingly, Plaintiff seeks injunctive and other equitable
3 relief to prevent the irreparable injury that Company shareholders will
4 continue to suffer absent judicial intervention.

5 ### FIRST CAUSE OF ACTION

6 ### (Against the Individual Defendants for Breach of Fiduciary Duties)

7    89.    Plaintiff incorporates each and every allegation set forth above
8 as if fully set forth herein.

9    90.    The Individual Defendants have violated fiduciary duties owed
10 to public shareholders of Hot Topic.

11    91.    As alleged herein, the Individual Defendants have initiated a
12 process to sell Hot Topic that undervalues the Company and vests them with
13 benefits that are not shared equally by Hot Topic's public shareholders. In
14 addition, by agreeing to the Proposed Transaction, the Individual
15 Defendants have capped the price of Hot Topic at a price that does not
16 adequately reflect the Company's true value. Moreover, Defendants failed
17 to sufficiently inform themselves of Hot Topic's value, or disregarded the
18 true value of the Company, in an effort to benefit themselves. Furthermore,
19 any alternate acquirer will be faced with engaging in discussions with a
20 management team and board that is committed to the Proposed Transaction.
21 Finally, Defendants have failed to provide Hot Topic's public shareholders
22 with all material information necessary to cast a fully informed vote in
23 connection with the Proposed Transaction.

24    92.    As such, unless the Individual Defendants' conduct is enjoined
25 by the Court, they will continue to breach their fiduciary duties to Plaintiff
26 and the other members of the Class, and will further a process that inhibits
27 the maximization of shareholder value and the disclosure of material
28 information.

93.     Plaintiff and the members of the Class have no adequate remedy at law. Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from immediate and irreparable injury, which the Individual Defendants' actions threaten to inflict.

## SECOND CAUSE OF ACTION

**(Against Sycamore Partners, 212F Holdings, and Merger Sub for Aiding and Abetting the Individual Defendants' Breaches of Fiduciary Duty)**

94.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

95.     Sycamore Partners, 212F Holdings, and Merger Sub have acted and are acting with knowledge of, or with reckless disregard to, the fact that the Individual Defendants are in breach of their fiduciary duties to the public shareholders of Hot Topic, and have participated in such breaches of fiduciary duties.

96.     Sycamore Partners, 212F Holdings, and Merger Sub knowingly aided and abetted the Individual Defendants' wrongdoing alleged herein. In so doing, Sycamore Partners, 212F Holdings, and Merger Sub rendered substantial assistance in order to effectuate the Individual Defendants' plan to consummate the Proposed Transaction in breach of their fiduciary duties.

97.     Plaintiff and the members of the Class have no adequate remedy at law.

## THIRD CAUSE OF ACTION

**(Brought Individually Against the Individual Defendants and Hot Topic for Violation of Section 14 of the Exchange Act)**

98.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

99.     The Individual Defendants and Hot Topic have caused the

1  Proxy to be issued with material omissions.

2      100.   The Proxy is an essential link in the accomplishment of the

3  Proposed Transaction.

4      101.   In the exercise of reasonable care, the Individual Defendants

5  and Hot Topic should have known that the Proxy omits material facts that

6  are necessary to render it non-misleading.

7      102.   The omissions in the Proxy are material to Plaintiff, and

8  Plaintiffs will be deprived of their right to make a fully informed decision if

9  such omissions are not corrected prior to the shareholder vote on the

10  Proposed Transaction.

11              **PRAYER FOR RELIEF**

12      **WHEREFORE**, Plaintiff demands relief in their favor and in favor

13  of the Class and against Defendants as follows:

14      A.     Declaring that this action is properly maintainable as a Class

15  action and certifying Plaintiff as Class representative;

16      B.     Enjoining Defendants, their agents, counsel, employees and all

17  persons acting in concert with them from consummating the Proposed

18  Transaction, unless and until the Company adopts and implements a

19  procedure or process to obtain a merger agreement providing the best

20  available terms for shareholders;

21      C.     Rescinding, to the extent already implemented, the Proposed

22  Transaction or any of the terms thereof, or granting Plaintiffs and the Class

23  rescissory damages;

24      D.     Directing the Individual Defendants to account to Plaintiffs and

25  the Class for all damages suffered as a result of the wrongdoing;

26      E.     Awarding Plaintiff the costs and disbursements of this action,

27  including reasonable attorney' and experts' fees; and

28

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff prays for a jury trial on all issues and in all proceedings so triable.

DATED: April 25, 2013

Respectfully submitted,

Evan J. Smith
BRODSKY & SMITH, LLC
9595 Wilshire Boulevard,
Suite 900
Beverly Hills, CA 90212
Telephone: (310) 300-8425
Facsimile:  (310) 247-0160

*Attorneys for Plaintiff*

Published on *Central District of California* (http://www.cacd.uscourts.gov)

Home > Reduced Service Days

In order to adjust to the sequester cuts in the Court's budget, the United States District Court, Central District of California, will furlough staff and reduce Court services on specific Fridays between April 26 through the end of August 2013 in all three of its divisions – Western (Los Angeles), Southern (Santa Ana), and Eastern (Riverside).

The days on which the Court will be closed and only reduced services will be available are as follows:

Friday, April 26, 2013

Friday, May 24, 2013

Friday, June 21, 2013

Friday, July 12, 2013

Friday, July 26, 2013

Friday, August 16, 2013

Friday, August 30, 2013

The courthouses in each division will remain open on these days, but the Clerk's Office will be closed except for the following services:

- The criminal intake section will be open to process bond-related matters, new arrests, and other documents necessary for the criminal duty calendar, which will continue to be held.
- The following emergency civil filings will be accepted:
  - A new action where the statute of limitation expires that day.
  - An application for a temporary restraining order regarding an event that will take place prior to the next business day.
  - An application for a warrant for the arrest of a vessel regarding an event that must take place prior to the next business day.

CM/ECF will be available for electronic filing on Reduced Service days.

**Terry Nafisi**
**Clerk of Court**

March 22, 2013

**Source URL (retrieved on *04/02/2013 - 10:19*):** http://www.cacd.uscourts.gov/news/reduced-service-days

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

**NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY**

This case has been assigned to District Judge S. James Otero and the assigned discovery Magistrate Judge is Jacqueline Chooljian.

The case number on all documents filed with the Court should read as follows:

## CV13- 2939 SJO (JCx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=====================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [ ] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

CV-18 (03/06)        NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY